**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

BRIAN KATZ, Individually and on Behalf of All Others Similarly Situated, )
)
)
Plaintiff, )
)
v. )
)
CINCINNATI BELL INC., LYNN A. WENTWORTH, LEIGH R. FOX, MEREDITH J. CHING, WALTER A. DODS JR., CRAIG F. MAIER, MARTIN J. YUDKOVITZ, JOHN W. ECK, RUSSELL P. MAYER, JAKKI LYNN HAUSSLER, and THEODORE H. TORBECK, )
)
)
)
)
)
)
)
)
Defendants. )

Case No.    1:20-cv-1607

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Brian Katz ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.       This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Cincinnati Bell Inc. ("Cincinnati Bell" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Cincinnati Bell, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Cincinnati Bell and Brookfield Infrastructure and its institutional partners ("Brookfield").

2.       On December 21, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $10.50 in cash for each share of Cincinnati Bell stock they own (the "Merger Consideration").

3.       On February 4, 2020, in order to convince Cincinnati Bell shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading preliminary proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.       While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.       In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Cincinnati Bell shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Cincinnati Bell's financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley") and Moelis & Company LLC ("Moelis") in support of their opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Cincinnati Bell shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took

place in this District and the Company's common stock trades on the New York Stock Exchange, which is headquartered in this District.

## PARTIES

11.    Plaintiff is, and at all relevant times has been, a holder of Cincinnati Bell common stock.

12.    Defendant Cincinnati Bell is incorporated in Ohio and maintains its principal executive offices at 221 East Fourth Street, Cincinnati, Ohio 45202. The Company's common stock trades on the NYSE under the ticker symbol "CBB."

13.    Individual Defendant Lynn A. Wentworth is Cincinnati Bell's Chairman and has been a director of Cincinnati Bell since April 2008.

14.    Individual Defendant Leigh R. Fox is Cincinnati Bell's President and Chief Executive Officer and has been a director of Cincinnati Bell since March 2018.

15.    Individual Defendant Meredith J. Ching has been a director of Cincinnati Bell since July 2018.

16.    Individual Defendant Walter A. Dods Jr. has been a director of Cincinnati Bell since July 2018.

17.    Individual Defendant Craig F. Maier has been a director of Cincinnati Bell since July 2008.

18.    Individual Defendant Martin J. Yudkovitz has been a director of Cincinnati Bell since July 2015.

19.    Individual Defendant John W. Eck has been a director of Cincinnati Bell since October 2014.

20.    Individual Defendant Russell P. Mayer has been a director of Cincinnati Bell since October 2013.

21.    Individual Defendant Jakki Lynn Haussler has been a director of Cincinnati Bell since April 2008.

22.    Individual Defendant Theodore H. Torbeck has been a director of Cincinnati Bell since January 2013.

23.    The Individual Defendants referred to in paragraphs 13-22 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Cincinnati Bell (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

25.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable.  As of December 17, 2019, there were approximately 51,000,000 shares of Cincinnati Bell common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Cincinnati Bell will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of

the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.     The Proposed Transaction

26.    Cincinnati Bell provides integrated communications and IT solutions to consumers and business customers through two business segments. The Company's Entertainment and Communications segment provides high speed data, video, and voice solutions to consumers and businesses over an expanding fiber network and a legacy copper network. The Company's IT Services and Hardware segment provides for the sale and service of efficient, end-to-end communications and IT systems and solutions.

27.    On December 23, 2019, Cincinnati Bell and Brookfield issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

CINCINNATI, Dec. 23, 2019 /PRNewswire/ -- Cincinnati Bell Inc. (NYSE:CBB), together with Brookfield Infrastructure (NYSE: BIP; TSX: BIP.UN), today announced an agreement through which Brookfield Infrastructure and its institutional partners will acquire Cincinnati Bell in a transaction valued at approximately $2.6 billion, including debt (the "Transaction").

Pursuant to the agreement, each issued and outstanding share of Cincinnati Bell common stock will be converted into the right to receive $10.50 in cash at closing of the Transaction. The Transaction price of $10.50 per share of Cincinnati Bell common stock represents a 36% premium to the closing per share price of $7.72 on December 20, 2019 and an 84% premium to the 60-day volume weighted average price. The Transaction has received unanimous approval of Cincinnati Bell's Board of Directors and is subject to customary closing conditions, including Cincinnati Bell shareholder approval and regulatory approval.

Lynn A. Wentworth, Chairman of the Cincinnati Bell Board of Directors, said, "After thoroughly reviewing a range of strategic alternatives and possible business

opportunities for maximizing value, the Board determined this transaction was in the best interest of the company, its shareholders, and its customers. The transaction provides clear and immediate value at an attractive premium and represents an exciting new chapter for Cincinnati Bell."

Leigh Fox, President and Chief Executive Officer of Cincinnati Bell, continued, "The transaction strengthens our financial position, enabling accelerated investment in our strategic products that is not presently available to Cincinnati Bell as a standalone company. This will allow us to drive growth and maximize value over the long term to the benefit of all our stakeholders. With Brookfield Infrastructure's support, we will be better positioned to deliver next generation, integrated communications for our customers through an expanded fiber network. Brookfield Infrastructure provides strong industry expertise with a proven track record of investment in critical data service and infrastructure. The financial, management, and other resources made available to Cincinnati Bell through the acquisition will enhance our networks and services to the benefit of our customers in Hawaii, Ohio, Kentucky, and Indiana, and across the nation."

"This investment represents an opportunity for Brookfield Infrastructure to acquire a great franchise and leading fiber network operator in North America," said Sam Pollock, Chief Executive Officer of Brookfield Infrastructure. "We are excited to leverage our operating expertise to work with the company's management team as it completes its industry-leading fiber optic rollout plan. Cincinnati Bell is a great addition to our data infrastructure portfolio and we expect it will contribute strong utility-like cash flows with predictable growth."

Cincinnati Bell owns and operates the leading data transmission and distribution network in Cincinnati, Ohio and Hawaii, with a footprint of over 1.3 million homes, delivering core fiber broadband, video and voice services to residential and enterprise customers. The business is undergoing an industry-leading transformation to upgrade its network to next generation fiber, which will be critical to support the growing demand for data and the advent of 5G. Thus far, Cincinnati Bell has future-proofed 50% of its network, representing more than 17,000 miles of dense metro and last-mile fiber and has plans to further upgrade its network over the next few years. The ongoing fiber upgrade allows Cincinnati Bell to provide utility-like services for broadband and data, generating stable and growing cash flows.

Brookfield Infrastructure is a leading global company with a long-standing history as an owner and operator of high-quality infrastructure assets. It has a global portfolio of assets in the utilities, transport, energy and data infrastructure sectors across North and South America, Asia Pacific and Europe.

The Transaction is expected to close by the end of 2020. It is subject to certain customary closing conditions, including the approval by Cincinnati Bell's shareholders, expiration or termination of the waiting period under the Hart-Scott-

Rodino Antitrust Improvements Act of 1976 and certain regulatory approvals. Cincinnati Bell will file a current report on Form 8-K with the U.S. Securities and Exchange Commission containing a summary of the terms and conditions of the proposed acquisition as well as a copy of the merger agreement.

**Advisors**

White & Case LLP is serving as lead legal advisor to Brookfield Infrastructure on this Transaction. Financing will be led by a syndicate of banks including Bank of America, BMO Capital Markets Corp., Citigroup Global Markets Inc., TD Securities and Wells Fargo Securities, LLC.

Morgan Stanley & Co. LLC and Moelis & Company LLC are acting as financial advisors and Cravath, Swaine & Moore LLP, Morgan, Lewis & Blockius LLP, and BosseLaw PLLC are acting as legal advisors to Cincinnati Bell.

**Cincinnati Bell Inc.** has headquarters in Cincinnati, Ohio. Cincinnati Bell delivers integrated communications solutions to residential and business customers over its fiber-optic and copper networks including high-speed internet, video, voice and data. The Company provides service in areas of Ohio, Kentucky, Indiana and Hawaii. In addition, enterprise customers across the United States and Canada rely on CBTS and OnX, wholly-owned subsidiaries, for efficient, scalable office communications systems and end-to-end IT solutions. For more information, please visit www.cincinnatibell.com. The information on the Company's website is not incorporated by reference in this press release.

**Brookfield Infrastructure Partners** is a leading global infrastructure company that owns and operates high-quality, long-life assets in the utilities, transport, energy and data infrastructure sectors across North and South America, Asia Pacific and Europe. We are focused on assets that generate stable cash flows and require minimal maintenance capital expenditures. Brookfield Infrastructure Partners is listed on the New York and Toronto stock exchanges. Further information is available at www.brookfield.com/infrastructure.

Brookfield Infrastructure is the flagship listed infrastructure company of Brookfield Asset Management, a global alternative asset manager with over $500 billion of assets under management. For more information, go to www.brookfield.com.

28.     Cincinnati Bell is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger

Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

29.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading Proxy

30.     On February 4, 2020, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

31.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses that "certain financial forecasts of the Company . . . were furnished to the Board, the Company's financial advisors, Brookfield Infrastructure and certain other parties potentially interested in a transaction with the Company, in connection with the discussions concerning the proposed merger."  Proxy 50.

32.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

33.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

34.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual

results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

35.     Here, Cincinnati Bell's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it and determine that the Proposed Transaction is fair to, and in the best interests of the Company and its shareholders. Proxy 44-49.

36.     As discussed further below, the non-GAAP financial projections used do not provide Cincinnati Bell's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

37.     The Proxy discloses that "certain financial forecasts of the Company . . . were furnished to the Board, the Company's financial advisors, Brookfield Infrastructure and certain other parties potentially interested in a transaction with the Company, in connection with the discussions concerning the proposed merger." *Id.* at 50.

38.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2024 for: (1) Adjusted EBITDA and (2) Unlevered Free Cash Flow for Cincinnati Bell, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 52-53.

39.     The Proxy defines Adjusted EBITDA as "operating income plus depreciation, amortization, stock based compensation, restructuring and severance related charges, any gains or losses on the sale or disposal of assets, transaction and integration costs, asset impairments and other special items." *Id.* at 52 n.1. Nevertheless, the Proxy fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA, rendering the Proxy materially false and/or misleading. *Id.* at 52-53.

40.     The Proxy provides two definitions of Unlevered Free Cash Flow ("UFCF"). As calculated by the Company's management UFCF is defined as "Adjusted EBITDA less capital expenditures." *Id.* at 52 n.2.  As defined by the financial advisors, UFCF is defined as "Adjusted EBITDA less stock based compensation and less depreciation and amortization, then subtracting for taxes, plus depreciation and amortization, less capital expenditures, less pension and OPEB payments, less changes in working capital, less restructuring and severance costs, less integration costs." *Id.* at 53 n.3.  Nevertheless, the Proxy fails to reconcile either calculated UFCF to its most comparable GAAP measure or disclose the line items used to calculate the financial advisors' iteration of UFCF, rendering the Proxy materially false and/or misleading. *Id.* at 52-53.

41.     Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

42.     The non-GAAP financial projections disclosed on pages 52-53 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial

measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

43.   As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

44.   The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

45.   Defendants must comply with Regulation G.  More specifically, the Company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

and presented in accordance with GAAP. 17 C.F.R. § 244.100. This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

46. Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5] Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Cincinnati Bell included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

---

[4] SEC, *Final Rule.*

[5] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-*

47.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

48.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into

---

*GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov /Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Feb. 21, 2020).

compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

49.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

50.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "Investors should also note that these non-GAAP financial measures presented in this proxy statement have no standardized meaning prescribed by GAAP and, therefore, have limits in their usefulness to investors. Because of the non-standardized definitions, the non-GAAP financial measures as used by the Company in this proxy statement and the accompanying footnotes may be calculated differently from, and therefore may not be directly comparable to, similarly titled measures used by the Company's competitors and other companies, or any similarly titled measures used by Brookfield Infrastructure, which prepares and publishes its financial statements in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board. Due to the inherent limitations of non-GAAP financial measures, investors should consider non-GAAP measures only as a supplement to, not as a substitute for or as a superior measure to, measures of financial performance prepared in accordance with GAAP." Proxy 51.

51.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

52.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 52-53, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

53.     The summary of the valuation methodologies utilized by Morgan Stanley and Moelis, including the utilization of certain of the non-GAAP financial projections described above by Morgan Stanley and Moelis, in connection with their valuation analyses (*id.* at 54, 62) is misleading in violation of Regulation 14a-9.   The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.   Once a proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

54.     With respect to Morgan Stanley's *Discounted Future Equity Value Analysis*, the Proxy discloses that Morgan Stanley calculated the discounted equity value of the Company's Adjusted EBITDA by using the Company's forecasted 2023 Adjusted EBITDA value and applying a range of aggregate value to EBITDA ratios to the estimate. *Id.* at 57. The range of aggregate value to EBITDA ratios was based on the range of aggregate values to EBITDA ratios calculated in Morgan Stanley's Comparable Companies analysis. *Id.* Morgan Stanley then subtracted the future amount of net debt and preferred equity as provided by the Company's management and discounted using a cost of equity ranging from 11.7% to 12.9%.  *Id.*

55.     The Proxy fails to disclose the range of aggregate values to EBITDA ratios that were applied, the future amount of net debt and preferred equity, and the inputs and assumptions that went into the selection of the Company's cost of equity.

56.     Both Morgan Stanley and Moelis performed a discounted cash flow analysis on the Company.  With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy states that Morgan Stanley calculated the present value of future unlevered free cash flows that Company was expected to generate and its terminal value, using a discount rate range of 7.4% to 7.8% based on the Company's weighted average cost of capital.  *Id.* at 58.  In order to calculate the terminal value, Morgan Stanley applied a range of exit multiples from 5.5x to 6.25x to the Company's terminal year estimated Adjusted EBITDA.  *Id.*  Morgan Stanley then subtracted the Company's outstanding debt and preferred equity and divided by the fully diluted share count as of December 17, 2019, as provided by Company management, in order to arrive at an implied value per Company common share. *Id.* Additionally, Morgan Stanley analyzed the impact from the Company's utilization of net operating losses over the period and discounted them at the Company's weighted average cost of capital rate range. *Id.* at 58-59.

57.     The Proxy fails to specify the period of time the analysis takes place over or even identify the terminal year, disclose the calculated range of terminal values, the inputs and assumptions that went into the selection of the exit multiple range, any of the inputs that were used to calculate the Company's weighted average cost of capital nor the value of the net operating losses.

58.     With respect to Moelis's *Discounted Cash Flow Analysis*, the Proxy states that Moelis calculated the present value of the estimated future unlevered after-tax free cash flows projected to be generated by the Company and the present value of the Company's estimated terminal value, taking into account the present value of the Company's net operating losses, using a discount rate range of 8.00% to 9.25%.  *Id.* at 64.  In order to calculate the terminal value, Moelis applied a range of estimated terminal values of 5.75x to 6.50x estimated terminal year Adjusted

EBITDA.  *Id.*  Moelis separately valued and discounted the net operating losses at the cost of equity, as provided by Company management on September 18, 2019.  *Id.*

59.    The Proxy fails to specify the period of time the analysis takes place over or even identify the terminal year, disclose the calculated range of terminal values, the inputs and assumptions that went into the selection of the terminal year Adjusted EBITDA multiple range, any of the inputs that were used to calculate the Company's weighted average cost of capital, the Company's cost of equity and its inputs, nor the present value of the net operating losses.

60.    Since information was omitted, shareholders are unable to discern the veracity of Morgan Stanley and Moelis's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare Morgan Stanley and Moelis's calculations with the Company's financial projections.  The absence of any single piece of the above information renders Morgan Stanley and Moelis's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

61.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id*. (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

62.     Therefore, in order for Cincinnati Bell shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

63.     In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Cincinnati Bell shareholders.

64.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

65.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

67.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [Proxy] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

68.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

69.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

70.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

73.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

74.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

75.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

76.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

77.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

78.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

79.     Cincinnati Bell is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

80.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

81.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of Cincinnati Bell within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Cincinnati Bell, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

84.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Proxy.

86.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

87.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

88.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding

with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  February 24, 2020

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ James M. Wilson, Jr._
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
      jwilson@faruqilaw.com

*Counsel for Plaintiff*

- 27 -

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF**

I, Brian Katz ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Cincinnati Bell Inc. ("Cincinnati") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Cincinati securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 20th day of February, 2020.

_____
Brian Katz

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 12/03/19 | 400 |
|  |  |  |
|  |  |  |